# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT     :     ss: BRIDGEPORT

                                  :

                                  :

FAIRFIELD COUNTY           :     JANUARY 31, 2014

*FILED*

*2019 JAN 16  A 9:39*
*U.S. DISTRICT COURT*
*BRIDGEPORT CT*

3:19 mj 151 (WIG)
3:19 mj 159 (WIG)
3:19 mj 163 (WIG)

## AFFIDAVIT

I, DAVID GUIDA, being duly sworn, deposes and states the following:

## AGENT BACKGROUND AND INTRODUCTION

1. I am a Special Agent for the Defense Criminal Investigative Service ("DCIS"), of the Office of the Inspector General for the United States Department of Defense ("DOD"), and have been so employed since July of 2012. I am presently assigned to DCIS in New Haven, Connecticut. Prior to my employment with DCIS, I was employed as a United States Postal Inspector with the United States Postal Inspection Service in New York, New York, and as a Special Agent with the Drug Enforcement Administration in Miami, Florida. I have been employed as a criminal investigator for six years and have participated in criminal investigations involving the trafficking of narcotics, credit card fraud, and fraudulent check schemes. Since joining DCIS, I have been involved in investigations related to defense contractor fraud, wire fraud, product substitution violations, and the illegal exportation of military items without an export license.

## DESCRIPTION OF THE PROPERTY/PREMISES TO BE SEARCHED

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to seize and search for evidence from the following:

    (a) the email accounts arash5427@gmail.com and mkhazaee5427@gmail.com, which are stored at premises controlled by, and service for which is provided by



Google, Inc., a service provider headquartered in Mountain View, California, as described in Attachment A, for the things described in Attachment A-1; and

(b) the contents of a two crate, forty-four (44) box shipment seized on or about November 26, 2013 in Long Beach, California, including but not limited to documents, an Iomega external hard drive, P/N 31460200, Model LDHD250-U and the contents thereof, and approximately 37 computer discs and the contents thereof, all shipped by Mozaffar Khazaee destined for Iran, as described in Attachment B, for the things described in Attachment B-1; and

(c) a Lenovo, Model 4446 Laptop Computer, S/N L3-BFV1D 09/05, seized on or about January 9, 2014 in Indianapolis, Indiana from the premises described as 5317 Holly Springs East Drive, Indianapolis, Indiana, as described in Attachment C, for the things described in Attachment C-1.

collectively, (the subject "property" or "premises") all for possible evidence of violations of:

Title 18, United States Code, Section 2314 (transportation of stolen property in interstate or

foreign commerce); Title 18, United States Code, Section 1832 (theft of trade secrets); Title 22,

United States Code, Section 2778 (the Arms Export Control Act or "AECA"), the Iranian

Transactions and Sanctions Regulations, Title 31 Code of Federal Regulations, Part 560, and the

International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701-

1707 ("IEEPA").

3.  The facts set forth in this affidavit are based upon my personal observations, my

training and experience, and information obtained from other agents and witnesses, including

federal law enforcement agents employed by the United States Department of Homeland

Security ("DHS"), Homeland Security Investigations ("HSI"), the Federal Bureau of

Investigation ("FBI"), the United States Customs and Border Protection Service ("CBP"), the

United States Air Force's Office of Special Investigations ("OSI"), and the Department of

Commerce's Boston Office of Export Enforcement ("Commerce").

2

4. Because this affidavit is being submitted for the limited purpose of securing the requested search warrants, this affidavit does not purport to set forth all of the facts and circumstances known to me about this matter. Instead, this affidavit sets forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2314 and 1832, 22 U.S.C. § 2778, 31 C.F.R. Part 560, and 50 U.S.C. §§ 1701-1707 will be found on or in the subject property / premises listed above.

## APPLICABLE LAW

### *The Arms Export Control Act and the International Traffic in Arms Regulations*

5. By way of background, the Arms Export Control Act (the "AECA"), 22 U.S.C. §§ 2751-2799, prohibits the export of defense materials without first obtaining a license from the Department of State. Section 38 of the AECA, 22 U.S.C. § 2778, regulates the export from and import into the United States of "defense articles" and "defense services." The State Department, Directorate of Defense Trade Controls ("DDTC"), promulgates regulations under the AECA, which are known as the International Traffic in Arms Regulations (the "ITAR"). 22 C.F.R. §§ 120-130. The ITAR contain the United States Munitions List ("USML"), which sets forth 21 categories of defense articles and services that are subject to export licensing controls. *Id.* § 121.1.

6. Unless an exemption applies, the ITAR requires an export license from DDTC for the export of USML articles and related technical data to all destinations. *See* 22 C.F.R. §§ 123, 124 and 125. A license application must describe the munitions sought to be exported with particularity, as well as set forth the ultimate consignee and end use. The ITAR outlines the requirements for end-user certifications, stating that "the country designated as the country of ultimate destination on an application for an export license . . . must be the country of ultimate

3

end-use." *See* ITAR § 123.9.  Any further export or diversion from the listed country of ultimate

destination is prohibited unless the DDTC issues prior written approval.  *See id*, § 123.9(a).

7.  In addition, and as set forth in ITAR § 126.1 "[i]t is the policy of the United States to

deny licenses and other approvals for exports and imports of defense articles and defense

services, destined for or originating in certain countries." *See* 22 C.F.R. § 126.1(a).  Among other

countries, this policy applies to Iran.  *See id.*  In addition, "[w]henever the United Nations

Security Council mandates an arms embargo, all transactions that are prohibited by the embargo

and that involve U.S. persons . . . anywhere, or any person in the United States, and defense

articles or services of a type enumerated on the United States Munitions List . . . irrespective of

origin, are prohibited under the ITAR for the duration of the embargo, unless the Department of

State publishes a notice in the Federal Register specifying different measures." *See* ITAR §

126.1(c).  This prohibition includes "transactions involving trade by U.S. persons who are

located inside or outside of the United States in defense articles or services of U.S. or foreign

origin that are located inside or outside of the United States." *See id.*  United Nations Security

Council arms embargoes include Iran.  *See* ITAR § 126.1(c)(5).  The ITAR also prohibits

"[e]xports to countries which the Secretary of State has determined to have repeatedly provided

support for acts of international terrorism," including Iran.  *See* ITAR § 126.1(d).  In short, "[n]o

sale, export, transfer, reexport, or retransfer of, and no proposal or presentation to sell, export,

transfer, reexport, or retransfer, any defense articles or defense services . . . may be made to

[Iran] . . . or to any person acting on its behalf, whether in the United States or abroad, without

first obtaining a license or written approval of the Directorate of Defense Trade Controls.

However . . . it is the policy of the Department of State to deny licenses and approvals in such

cases." *See* ITAR § 126.1(e)(1).

4

8. The AECA includes criminal penalties for any willful violations of the AECA or the

ITAR, or for any willful false statement made in a license application or required report.

Specifically, Title 22, United States Code, Section 2778(c), provides:

> Any person who willfully violates any provision of this section or section 2779 of this title, or any rule or regulation issued under this section, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statement therein not misleading, shall [be guilty of a crime].

22 U.S.C. § 2778(c).

### *The International Emergency Economic Powers Act*

9. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-

1707 (1996), prohibits the violation of regulations issued thereunder, particularly those

regulations promulgated by the Department of Treasury imposing trade embargoes and other

export restrictions on particular countries, such as Iran.

10. With certain exceptions, IEEPA gives the President broad authority to regulate

exports and other international transactions in times of national emergency. Specifically, upon a

declaration of a national emergency, IEEPA authorizes the President, as to any person or with

respect to any property "subject to the jurisdiction of the United States," to prescribe regulations,

and by means of instructions, licenses or otherwise:

    (A)    [to] investigate, regulate, or prohibit --

        (1)    any transactions in foreign exchange,

        (2)    transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

        (3)    the importing and exporting of currency or securities; and



> (B)   [to] investigate, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest.

*Id.* § 1702(a)(1).

11.   IEEPA controls are triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which has as its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." *Id.* § 1701.   Executive orders issued under IEEPA may impose a broad trade embargo against a particular country that is more comprehensive than export controls in that it bars U.S. persons from engaging in a broad range of transactions involving the offending foreign government or its nationals, unless specific government authorization is obtained in advance. Examples of this type of embargo include the Iran sanctions programs.   Other IEEPA based sanctions programs are trans-border and apply only to dealings with particular designated entities or individuals and their property wherever located and without limitation to a specific country. Examples of this type of program include sanctions against significant narcotics traffickers, terrorists, and terrorist organizations.

12.   After an executive order is issued, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") generally publishes implementing regulations in the Federal Register requiring exporters, importers and others to obtain licenses from OFAC prior to dealing with the targeted country or its nationals, or with narcotics traffickers, terrorists, or terrorist organizations.   The regulations promulgated by OFAC are found at 31 C.F.R. § 500, *et. seq.*



Examples of regulations or orders which restrict transactions relating to Iran are set forth at 31

C.F.R. § 560.

13. Specifically, the Iranian Transactions and Sanctions Regulations set forth in Title 31,

Part 560 of the United States Code of Federal Regulations generally prohibit the provision of

services, and trade and investment activities with Iran or the Government of Iran by U.S. persons

or entities. Among other things, the Iranian Transactions and Sanctions Regulations provide that

> the exportation, reexportation, sale, or supply, directly or indirectly, from the
> United States, or by a United States person, wherever located, of any goods,
> technology, or services to Iran or the Government of Iran is prohibited, including
> the exportation, reexportation, sale, or supply of any goods, technology, or
> services to a person in a third country undertaken with knowledge or reason to
> know that:
>
> (a)  Such goods, technology, or services are intended specifically for supply,
>       transshipment, or reexportation, directly or indirectly, to Iran or the
>       Government of Iran; or
>
> (b)  Such goods, technology, or services are intended specifically for use in the
>       production of, for commingling with, or for incorporation into goods,
>       technology, or services to be directly or indirectly supplied, transshipped,
>       or reexported exclusively or predominantly to Iran or the Government of
>       Iran.

*See* 31 C.F.R. § 560.204.

14. Willful violations of IEEPA carry criminal penalties. Specifically, 50 U.S.C. §

1705(c) provides that whoever "willfully commits, willfully attempts to commit, or willfully

conspires to commit, or aids or abets in the commission of, [a violation of IEEPA] shall [be

guilty of a crime.]." 50 U.S.C. § 1705(c).

### *Transportation of Stolen Property in Interstate or Foreign Commerce*

15. Title 18, United States Code, Section 2314 prohibits the transportation of stolen

property in interstate or foreign commerce and provides, in pertinent part, that:



> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [shall be guilty of a crime].

*See* 18 U.S.C. § 2314. Title 18, United States Code, Section 2311 defines "value" to mean "the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof." *See* 18 U.S.C. § 2311.

### *Theft of Trade Secrets*

16. Title 18, United States Code, Section 1832 prohibits the theft of trade secrets and provides, in pertinent part, that:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly –
>
> (1)  steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
>
> (2)  without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>
> (3)  receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
>
> (4)  attempts to commit any offense described in paragraphs (1) through (3); or
>
> (5)  conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,
>
> shall [be guilty of a crime].

17. A "trade secret" includes "[a]ll forms and types of financial, business, scientific, technical, economic, or engineering information, if (A) the owner thereof has taken reasonable



measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public." 18 U.S.C. § 1839(3).

## FACTS AND CIRCUMSTANCES

### *Summary*

18.  Federal law enforcement agents began investigating KHAZAEE in November 2013 when CBP officers, assisted by HSI special agents, inspected a shipment that KHAZAEE sent by truck from Connecticut to a freight forwarder located in Long Beach, California, which was intended for shipment from the United States to the city of Hamadan in the Islamic Republic of Iran ("Iran"). The documentation for KHAZAEE's shipment indicated that it contained household goods. Upon inspecting the shipment, however, CBP officers and HSI personnel discovered that the content of the shipment contained numerous boxes of documents consisting of sensitive technical manuals, specification sheets, and other proprietary material relating to the United States Air Force's F35 Joint Strike Fighter ("JSF") program, and military jet engines. Additional documents contained information relating to gas turbines, unrelated to the JSF program or military jet engines, but which was nevertheless controlled, proprietary material. According to information provided by the Long Beach freight forwarder, the ultimate consignee (recipient) of KHAZAEE's shipment informed the freight forwarder that he was KHAZAEE's brother-in-law and that he intended merely to hold the goods until KHAZAEE returned to Iran. Upon further investigation, law enforcement learned that KHAZAEE holds Iranian and U.S. citizenship and, as recently as August 2013, worked as an engineer for defense contractors, including firms that are the actual owners of the technical and proprietary documents and materials in KHAZAEE's shipment. Representatives from those defense contractors have

9

informed federal agents that materials contained in KHAZAEE's shipment were proprietary and that KHAZAEE was required to return all such material to the firms at the end of his period of employment.

### Background

19. On November 26, 2013 a CBP Outbound Enforcement Team in Long Beach, California selected a shipment destined for Iran aboard the vessel NYK Libra for an outbound enforcement examination. The Shipper's Export Declaration declared the commodity as "House Hold Goods." After the shipment was placed on hold, the local freight forwarder informed CBP that the shipment could be examined at the freight forwarder's premises.

20. During the examination, CBP personnel inspected two crates belonging to shipper/exporter KHAZAEE destined for Iran, and discovered therein voluminous documents and other material containing technical data regarding the J136 engine and other documentation concerning the JSF program. CBP placed a hold on the shipment and directed the two crates to be transferred for a full warehouse examination. CBP then notified the HSI LA Counter-Proliferation Investigations Center of the discovery.

21. On December 4 and 5, 2013, CBP and HSI officers conducted a full warehouse examination on the two crates comprising KHAZAEE's shipment, which contained 44 boxes all labeled as belonging to KHAZAEE. During the course of the examination, CBP and HSI discovered thousands of pages contained in dozens of manuals/binders relating to the JSF program. The documents contained language regarding the technical specifications of the JSF engine program, as well as diagrams, blueprints, and other documentation relating to the inner-workings of the jet's engine. The documents examined were labeled as "Export-Controlled," as well as stamped with "ITAR-controlled" warnings. Additional documents contained proprietary

10

information relating to gas turbines.  Several of the documents also had markings indicating that they were the property of at least three defense contractors, referred to here as Company A, Company B, and Company C.

### *Evidence Related To Company A's Property*

22.  During the course of the investigation, federal agents learned that KHAZAEE's employment at Company A, located in Connecticut, ended effective August 19, 2013 as part of a reduction in force.  Agents attempted to visit KHAZAEE's last known residence in Connecticut – 345 Oakland Street, Apartment 37, Manchester, Connecticut – and learned that he had vacated the residence.

23.  Agents also reviewed employment records relating to KHAZAEE provided by Company A.  Among those records were KHAZAEE's separation agreement and new hire paperwork, including documents that KHAZAEE appeared to have signed upon entering and exiting the company, acknowledging his responsibility to surrender all company related reports, files, and other records to Company A upon his termination.  The documents KHAZAEE appeared to have signed also prohibited him from: (a) disclosing, using, or publishing any proprietary, technical, or business information developed by, for, or at the expense of Company A; and (b) disclosing to any person or entity, or assisting in the disclosure, publication or use by any person or entity, business information that became known to him during his employment.

24.  Federal agents from HSI and FBI also interviewed certain Company A personnel.  Company A personnel stated that during the time of KHAZAEE's employment, KHAZAEE's team conducted strength and durability evaluations for components of all Company A engines, including the F119 engine (a Company A engine solely manufactured for use in the United States Air Force's F-22 Raptor fighter aircraft).

25.  During the interview, agents reviewed with Company A personnel copies of some of the items recovered in KHAZAEE's shipment.  For example, Company A personnel reviewed a document entitled "F119 Diffuser Case September 24, 2010."  The bottom of the document's cover page contained the statement "PROPRIETARY NOTICE" followed by:

> This document is the property of [Company A] and is delivered on the express condition that it and the information contained in it are not to be used, disclosed, or reproduced in whole, or in part, for any purpose without the express written consent of [Company A]; and that no right is granted to disclose or so use any information contained in said document.  These restrictions do not limit the right to use information obtained from another source.

> WARNING this document contains technical data the export of which is or may be restricted by the Arms Export Control Act and the International Traffic in Arms Regulations (ITAR), 22 C.F.R. parts 120-130.  Diversion contrary to U.S. law is prohibited.  The export, reexport, transfer or re-transfer of this technical data to any other company, entity, person, or destination, or for any use or purpose other than that for which the technical data was originally provided by [Company A], is prohibited without prior written approval from [Company A] and authorization under applicable export control laws.  ITAR/USML Category (Subcategory): VIII(i)

> This document is marked to the highest level of export control and may contain technical data that is controlled at a lower level.  Consult your local Business Area Export Representative to determine if it is possible to revise or redact the document to change the level of export control.

Company A personnel stated that the materials belonged to Company A, and that they should never have left Company A's premises following the termination of KHAZAEE's employment there.

26.  Company A also confirmed that KHAZAEE signed a separation agreement with Company A on August 13, 2013, whereby he certified that he had returned all company files.  The document read, in pertinent part:

> SURRENDER OF MATERIALS: You acknowledge that you have returned to the company all company-related reports, files, memoranda, notes, records, and other documents (whether stored electronically or otherwise) as well as badges, credit



cards, cardkey passes, door and file keys, computer access codes, computer software, computers, laptops, cell phones, pagers, PDAs or other electronic devices, and any other property that you received or prepared or helped to prepare in connection with your employment. You further acknowledge that you have not and will not retain any copies or excerpts of the materials described above, and that you will not attempt to retrieve or recreate any of the materials described above after the termination of your employment.

INTELLECTUAL PROPERTY AND PRIVATE BUSINESS INFORMATION: Whether or not you sign this agreement, you, as a terminating employee, are reminded that the Intellectual Property Agreement entered into between you and the Company remains in full force and effect after the termination of your employment. The Intellectual Property Agreement states that you will not disclose, use or publish any proprietary, technical or business information developed by, for, or at the expense of the Company, or assigned or entrusted to the Company, unless such information becomes generally known outside the company (except through breach by you and of the Intellectual Property Agreement). Also, you agree not to disclose, use or publish to any person or entity, or assist the disclosure, publication or use by any person or entity, of any business information that became known to you during your employment with the company. You must deliver to or leave with the Company all written and other materials containing such information upon the termination of your employment.

27.    Company A also provided agents with a copy of the "Intellectual Property Agreement" KHAZAEE signed as a new hire on March 14, 2011, in which he agreed not to disclose proprietary information. Specifically, that "Intellectual Property Agreement" read, in pertinent part:

I will not, either during or after my employment, use, publish or otherwise disclose, except for [Company A's] benefit in the course of such employment, any technical or business information developed by, for or at the expense of [Company A], or assigned or entrusted to [Company A] by me or anyone else, unless such information is generally known outside of [Company A], and I will deliver to or leave with [Company A] all written and other materials containing such information upon termination of my employment.

28.    Company A also confirmed that the value of the documents exceeds $5,000.00. For example, among other things, the total cost of the work that was performed by Company A personnel in connection with the F119 Diffuser Case Analysis document dated September 24,



2010 – to include analytical work, document and summary creation, and communication of the
analysis to the government – was $352,720.00.

### *Evidence Related To Company B's Property*

29.   Federal agents from HSI and FBI also interviewed Company B personnel.  In
connection with the interviews, agents shared with Company B personnel copies of some of the
items recovered in KHAZAEE's shipment, which related to gas turbines, and were marked as
proprietary information of Company B.

30.   Company B personnel confirmed in an email that the materials were the property of
Company B and that they should never have left Company B's premises.  Company B personnel
also stated that KHAZAEE signed an Employee Innovation and Proprietary Information
Agreement stating KHAZAEE was not authorized to possess the documents after employment
with Company B.

31.   Company B also confirmed that the value of the documents exceeds $5,000.00.  For
example, one of Company B's documents reviewed by Company B personnel was part of a
report that reflected the involvement of eighteen engineers for approximately 3.75 hours. The
hourly rate for engineers is approximately $134.00, resulting in approximately $9045.00 in
engineering work and analysis performed.  Another Company B document reviewed by
Company B personnel was part of a report that was the result of lab tests costing between
$75,000.00 and $100,000.00.  Another Company B document reviewed by Company B
personnel was a complete copy of a report conducted for Company B by an outside vendor
retained by Company B.  According to Company B, the report had a cost and value between
$25,000.00 and $50,000.00.

14

*Evidence Related To Company C's Property*

32. Federal agents from OSI and DCIS also interviewed Company C personnel. During the interview, employees at Company C provided agents with a disc containing KHAZAEE's new hire paper work and KHAZAEE's termination paper work. Among the documents enclosed in the termination paper work was an "Intellectual Property Declaration," dated March 28, 2007, that KHAZAEE signed, declaring that he had returned all physical property as well as proprietary or technical information and publications acquired during, or as a result of KHAZAEE's employment with Company C.

*Additional Evidence in the Shipping Container, Fingerprint Analysis, and Further Evidence of Ownership and Possession*

33. During their review of materials contained in the shipping container, federal agents from HSI and officers from CBP discovered a document from Company A entitled "Turbine Durability: Creep" in box number 11.[1] The document has the following warning labels:

Warning

This document is the property of [Company A]. You may not possess, use, copy or disclose this document or any information in it, for any purpose without [Company A's] express written permission. Neither receipt nor possession of this document alone, from any source, constitutes such permission. Possession, use, copying or disclosure by anyone without [Company A's] express written permission is not authorized and may result in criminal and/or Civil Liability.

Each page in the "Turbine Durability: Creep" further stated: "Use or disclosure of information contained on this sheet is subject to the export and/or proprietary restriction on the title page of this document."

---

[1]     For ease of reference, when CBP conducted the initial inspection, CBP labeled KHAZAEE's shipment of 44 boxes, 1 through 44 on the outside of each box.



34.  Federal agents from HSI and officers from CBP also discovered a Technical Data Report from Company C with proprietary and export warnings on each page of the document.  In the top left corner of the document's cover page, "M. KHAZAEE" was written in red ink.  The handwriting appears to be KHAZAEE's and appears to match KHAZAEE's writing in his various agreements with Company A, Company B and Company C, KHAZAEE's United States passport application, as well as various documents found within KHAZAEE's immigration records.

35.  Federal agents from HSI and officers from CBP discovered numerous documents which appeared to be engineering-related materials in box number 10.

36.  HSI forensic personnel tested samples of the shipping materials for fingerprints, and a formal laboratory report, memorializing the results of the fingerprint analysis to date, was completed on or about January 23, 2014.  In that report, an HSI Senior Fingerprint Specialist memorialized having identified:

(a)    fingerprint matches for four (4) separate fingers of KHAZAEE on packaging tape on box number 1;

(b)    a fingerprint match for KHAZAEE on packaging tape on box number 10;

(c)    a fingerprint match for KHAZAEE on packaging tape on box number 11;

(d)    fingerprint matches for five (5) separate fingers of KHAZAEE on packaging tape on box number 12;

(e)    a fingerprint match for KHAZAEE on packaging tape on box number 26;

(f)    fingerprint matches for four (4) separate fingers of KHAZAEE on packaging tape on box number 27;

(g)    a fingerprint match for KHAZAEE on packaging tape on box number 30;

(h)    fingerprint matches for two (2) separate fingers of KHAZAEE on packaging tape on box number 33;

(i)     a fingerprint match for KHAZAEE on packaging tape on box number 35; and

(j)     three (3) fingerprint matches for KHAZAEE on packaging tape on box number 45.

37. In addition to the fingerprint results, numerous items in the shipment appeared be the property of KHAZAEE. Among the contents were several documents bearing KHAZAEE's name in printed type and in handwriting, notes with what appears to be KHAZAEE's handwriting, prescription medication containers imprinted with KHAZAEE's name, college documents relating to KHAZAEE, emails to and from KHAZAEE, an expired Iranian passport appearing to belong to KHAZAEE, and credit card bills addressed to him at his residence in Manchester, Connecticut.

### *Shipping Arrangements and Logistics*

38. Evidence relating to the shipping transaction shows that KHAZAEE intended to ship the materials from Connecticut by truck to Blue Sea Shipping Line, Inc., the freight forwarder in Long Beach, California, for the express purpose of shipping the materials by sea to Iran.

39. Specifically, during the course of the investigation, HSI Special Agents conducted a telephonic interview with an independent contractor affiliated with a Phoenix-based shipping logistics company. As a result of this interview, agents learned that on October 31, 2013, the aforementioned independent contractor received a telephone call from an international freight forwarder located in Long Beach, California seeking to arrange for the transportation of 44 pieces containing books and college related items, 2 suitcases, a vacuum cleaner and some other items weighing approximately 1500 pounds. These items were to be picked up from "Arash Khazaie," located at 345 Oakland Street Apt., 37 Manchester, CT 06042 and delivered to the Long Beach freight forwarder.

17



40.   During the interview, HSI Special Agents further learned that once the above-referenced independent contractor received the dimensions of the shipment from the freight forwarder, the employee entered the information into a website managed by the Phoenix-based logistics company, which quoted a price of $780 dollars to ship the goods.  The first company, who was the lowest bidder for the shipment would not accept the shipment because it was not palletized.  The independent contractor employee then selected the next lowest bid on the website which was from a trucking company based in Fountain Valley, California that accepted the bid to transport the items from Connecticut to California.  The trucking company required that the shipper load all of the boxes onto the truck.  Upon arranging for the trucking company to ship the items, the Phoenix-based logistics company was paid by the Long Beach freight forwarder, which was paid directly by KHAZAEE in the form of a personal check described in greater detail below.

41.   Federal agents also reviewed shipping documents provided to the Long Beach freight forwarder by KHAZAEE.  The documents listed the sender as "Mozaffar Khazaee, 345 Oakland Stress, [sic] Apt #37, Manchester, Connecticut 06042."  The documents listed the ultimate recipient as "Mohammad Payendeh, Hamadan, Residence of Mohammad Payendah, Honarestan Street, Ally of Towheed, Allay of shaheed Rahdar, Pelake:22," which is located in Iran.  Also included in the documents was a copy of a personal check from KHAZAEE for $1,735.00 written to the Long Beach freight forwarder and bearing a signature appearing to be KHAZAEE's.  The name and address printed on the check in the top left corner read, "MOZAFFAR KHAZAEE, 345 OAKLAND ST #37, MANCHESTER, CT 06042."  The "For" section of the check read:  "shipment of personal goods."

*Khazaee's Use of Computer and Digital Media, and the Subject Email Accounts*

42.   Based on my training and experience, and on conversations that I have had with other law enforcement officers, I am familiar with the practices and methods of persons who engage in transportation of stolen property in interstate or foreign commerce, theft of trade secrets and/or violations of export laws and regulations, and their reliance on email and computer technology to commit and/or further these criminal offenses.   Such individuals often create and maintain records relating to the conduct, including, e.g., proprietary and/or controlled materials, shipping records, travel records, communications, correspondence, emails, texts and memos, pictures, receipts, telephone records, bank account and financial information, notes and personal documents, template check and identification images, and the names of victims and any coconspirators, on electronic databases on computers, stored in electronic or magnetic form. Furthermore, users of computer equipment often create and maintain records of computer ownership and subscriptions to internet services.   Furthermore, such individuals also often engage in communications related to same via email with third parties, which are often stored or maintained by email service providers.   The evidence developed in the case to date confirms that there is probable cause to believe that the same holds true here.

43.   For example, among the shipping documents recovered by law enforcement agents was a typewritten document that stated, in pertinent part:

> Here is my info that you asked for. *The Farsi version is in the attachment of this email.*  So, there 1 file in the attachment: [sic]
> 1) Passport
> Let me know if all is ok.

> Sender address, in the United States of America is:
>      Mozaffar Khazaee
>      345 Oakland stress apt #37 [sic]
>      Manchester, Connecticut  06042

Receiver Address in Iran is:
       Mohammed Payendeh
         Hamadan,
         Residence of Mohammad Payendah
         Honarestan Street
         Ally of Towheed
         Allay of shaheed Rahdar [sic]
         Pelake: 22
         HOME PHONE:     811-838-5051
         MOBILE PHONE:   0918-818-5517

Regards,

M. khazaee [sic]

(hereafter the "typewritten email document") (emphasis added).

44.  Two additional handwritten documents relating to the shipment, written in a combination of English and Farsi, contained Khazaee's Connecticut address as well as an email account of arash5427@gmail.com.

45.  In addition, during the course of the investigation to date, agents discovered digital material appearing to belong to several defense contractors, including material marked with export control and proprietary information warnings, on some of the disks and on the hard drive contained in KHAZAEE's shipment.  For example, included on the hard drive in KHAZAEE's shipment were what appeared to be stored images and/or electronic copies of export controlled documents, which appear to be from U.S. based defense contractors and which bear warnings such as (1) "EXPORT CONTROLLED – WARNING – This document may contain information subject to the International Traffic in Arms Regulations (ITAR) or the Export Administration Regulations (EAR) of 1979.  This information may not be exported, released or disclosed to foreign nationals without first complying with export license requirements . . . ."   and (2) "PROPRIETARY RIGHTS LEGEND – This drawing and the information . . . herein is the

20

property of and proprietary to [Company C], and shall not, without prior written permission of

[Company C] be used or disclosed in whole or in part to third parties . . . ."  Another electronic

document on computer media in KHAZAEE's shipment stated:  "This document may contain

information whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec.

2751, Et. Seq.) or the Export Administration Act of 1979, as amended (Title 50, U.S.C., App

2401, Et. Seq.).  Violations to these export laws are subject to severe criminal penalties."  In the

same document, in a box in the center of the page, the document stated, in bold capital letters

"EXPORT CONTROLLED," and went on to state that the material "May only be exported or re-

exported under [a] valid export license or exemption in accordance with U.S. Export

Regulations."  The box also contained a blank for filling in any export authorization as follows:

"Export Authorization: _____."  The export authorization information, however,

was blank.  The hard drive also had information stored in differently named folders relating to

aircraft design and propulsion, such as "rocket propulsion design."  To date, agents have not

identified metadata or other forensic information revealing any computer(s) or network(s) from

which the material was downloaded, but their review nevertheless establishes KHAZAEE's use

and possession of what appears to be proprietary and export controlled material from U.S. based

defense contractors in digital format on a hard drive and on external digital media as well.

46.  Agents also discovered a copy of a publication entitled "Mastering SUB7 Hacker" in

KHAZAEE's shipment.  According to open source information, Sub7 is the name of a Remote

Administration Tool (RAT) program, originally designed by someone with the handle

"mobman."  Like other remote administration programs, Sub7 is distributed with a server and a

client.  The server is the program that the host must run in order to have targeted machines

controlled remotely, and the client is the program that the user/hacker runs on their own machine

to control the server/host PC.  According to open source information, computer security experts have said that with these features, Sub7 can allow a hacker to take "virtually complete control" over a computer.

47.  According to open source information, Sub7 has been used to gain unauthorized access to computers.  While it can be used for making mischief (such as making sound files play out of nowhere, change screen colors, etc.), it can also read keystrokes that occurred since the last boot—a capability that can be used to steal passwords and other information.  Today, however, many antivirus programs can detect Sub7 and prevent it from being installed unless steps are taken to hide it.

48.  In addition, and as discussed further below, during a post-arrest interview of KHAZAEE on January 9, 2014, KHAZAEE admitted to using the arash5427@gmail.com email account to correspond with the Long Beach, California freight forwarder, in furtherance of the shipment.  KHAZAEE further stated that the reason he had and used this arash5427@gmail.com account was because, when he set up his gmail account, he tried obtaining an account with the name Mozaffar, but it was not available.  KHAZAEE, however, never revealed to agents that he had also used a mkhazaee5427@gmail.com email account, which among other things, was included on a resume obtained from Company A, and on a cover letter recovered from computer media in his carry-on luggage, which appears to have been written when KHAZAEE was employed at Company C.

### *Khazaee's Arrest and Additional Evidence Gathered Pursuant to Post-Arrest Statements and Search Warrants*

49.  In December 2013, federal agents interviewed property management personnel at KHAZAEE's last known residence in Manchester, Connecticut and learned that KHAZAEE had

moved out of his residence approximately one month prior.  In order to locate KHAZAEE, federal agents initiated surveillance at KHAZAEE's previous residence in Indianapolis, Indiana, where KHAZAEE possessed a valid driver's license.  Surveillance personnel discovered that KHAZAEE had returned to a previous residence in Indianapolis.

50.  A query of law enforcement databases also revealed that KHAZAEE had become a naturalized United States citizen on December 6, 1991, and holds a valid United States passport. Additionally, a review of the shipping documents provided to the Long Beach freight forwarder by KHAZAEE included a copy of KHAZAEE's valid Iranian passport.  Travel records and databases further showed that KHAZAEE has traveled to Iran approximately five times in the last seven years.

51.  Further investigation revealed that KHAZAEE had reserved a flight scheduled to depart the United States for Tehran, Iran, on January 9, 2014.  Specifically, KHAZAEE was scheduled to fly on United Airlines Flight 4087 on January 9, 2014, departing Indianapolis, Indiana at approximately 11:31 a.m., and arriving in Newark, New Jersey around 1:30 p.m. KHAZAEE was then scheduled to depart the United States on January 9, 2014 aboard United Flight 50, departing Newark Liberty International Airport at approximately 7:20 p.m., and arriving in Frankfurt, Germany at approximately 9:15 a.m. on Friday, January 10th.  From Frankfurt, KHAZAEE was scheduled to travel on to Tehran, Iran.

52.  Law enforcement agents obtained and executed both a criminal complaint and arrest warrant for KHAZAEE for interstate transportation of stolen property, as well as search warrants for KHAZAEE's person, his checked and carry-on luggage, and any computer media therein or with him at the time.

53. On January 9, 2014, agents arrested KHAZAEE, without incident, in Newark Liberty International Airport, after KHAZAEE arrived as scheduled on United Airlines Flight 2087 from Indianapolis, Indiana. In addition to the arrest, agents executed search warrants on KHAZAEE's person, and his checked and carry-on luggage. Items seized during the execution of the warrants included, but were not limited to, financial documents including tax returns dating back as far as approximately 1997, a laptop computer, and electronic storage devices in the form of an external hard drive and two USB storage devices. Pursuant to the search warrants, agents also found and seized nearly $60,000 USD in cash, which had been split up into multiple bank envelopes in increments of, e.g., approximately $5,000, and stored in various places in KHAZAEE's carry-on luggage.

54. In KHAZAEE's checked luggage, agents also found a typewritten document that corresponded to the shipment described in detail above. The document read, in pertinent part:

Items#  . . . . total 44
*Receiver:*
    *Blue Sea shiping line, Inc*
    *Long Beach, California 90805*
    *phone # : (800) 222-7014*
                            item # 38

Sending:
    Mozaffar Khazaee
    345 Oakland Street Apt. 37
    Manchester, Connecticut  06042
    phone#: (860)646-4332
Total number of items in shipment is : 44

[sic] (emphasis in original).

55. In KHAZAEE's carry-on luggage, agents also found additional hard copy documents containing proprietary and export controlled material relating to the JSF program. One, a one page document relating to the "Joint Strike Fighter Program" contained references to Company

24



B and Company C "Proprietary Information" and stated, in bold capital letters: "NOT

APPROVED FOR EXPORT." A second, a Technical Data Report of Company C, was a 17

page "3-D Thermal Analysis of the JSF F136 Combustor Dome Panel for SDD." The document

contained a "PROPRIETARY RIGHTS LEGEND" reading, in pertinent part:

> This technical data and the information embodied herein is the property of and
> proprietary to [Company C], and shall not, without prior written permission of
> [Company C], be disclosed in whole or in part to third parties . . . .

The document also contained an "EXPORT CONTROLLED – WARNING," that read, in

pertinent part:

> This document may contain information subject to the International Traffic in
> Arms Regulations (ITAR) or the Export Administration Regulation (EAR) of
> 1979. This information may not be exported, released, or disclosed to foreign
> nationals without first complying with the export license requirements of the
> ITAR and/or the EAR . . . .

56. During the course of a custodial interview, in which KHAZAEE was advised of his

*Miranda* rights, knowingly waived those rights, and agreed to speak voluntarily with

investigators, KHAZAEE was shown shipping documents relating to the shipment. KHAZAEE

admitted to agents that he had created the "typewritten email document" quoted above, as well as

the handwritten documents relating to the shipment referenced above, containing both English

and Farsi, and which contained the arash5427@gmail.com email address. Additionally,

KHAZAEE stated to agents during the interview that he had specifically used the

arash5427@gmail.com email address to correspond with the Long Beach, California freight

forwarder in connection with the shipment.

57. During the course of the interview, agents also asked KHAZAEE about the name

"Arash Khazaie," which had also appeared on certain of the shipping documents. KHAZAEE

stated his belief that the name "Arash Khazaie" likely showed up on some of the shipping



documents as a result of (1) his use of his arash5427@gmail.com email address to correspond

with the Long Beach, California freight forwarder in connection with the shipment; and (2) a

misspelling of his last name.  KHAZAEE further stated that he had acquired and used this

arash5427@gmail.com email account was because, when he set up his gmail account, he tried

obtaining an account with the name Mozaffar, but it was not available.  During the course of the

interview, KHAZAEE did not state that he also had an email account corresponding to his name

– mkhazaee5427@gmail.com, which among other things, was included on a resume obtained

from Company A, and on a cover letter recovered from computer media in his carry-on luggage,

which appears to have been written when KHAZAEE was employed at Company C.

58.   In addition, preliminary analysis of the two USB storage devices seized pursuant to

the search warrants executed at or around the time of KHAZAEE's arrest revealed not only

additional documents that appeared to be proprietary and export controlled, but also resume and

application documents, dating from KHAZAEE's time at both Company A and Company C, in

which KHAZAEE was actively looking to gain employment with third parties – and in which he

stated:  "[a]s lead engineer in these projects I have learned some of the key technique[s] that

could be transferred" to such third parties.  KHAZAEE further stated that his interest in applying

"certainly . . . has to do with transferring my skill and knowledge" to third parties.  In the quoted

letter, KHAZAEE provided a phone number – and his mkhazaee5427@gmail.com email address

– among his contact information.

59.  Based on the above, there is probable cause to believe, and I do believe, that

violations of 18 U.S.C. §§ 2314 and 1832, 22 U.S.C. § 2778, 31 C.F.R. Part 560, and 50 U.S.C.

§§ 1701-1707 have been committed by KHAZAEE and that evidence of such violations will be

found in the subject email accounts.  There is therefore probable cause to search the email



accounts arash5427@gmail.com and mkhazaee5427@gmail.com, as described in Attachment A, for the things described in Attachment A-1.

### *Additional Information Regarding the Property / Premises to be Searched*

60.  The contents of the two crate, forty-four (44) box shipment seized on or about November 26, 2013 in Long Beach, California, including but not limited to the documents, the Iomega external hard drive, P/N 31460200, Model LDHD250-U and the approximately 37 computer discs and the contents, all shipped by Mozaffar Khazaee and destined for Iran, were initially seized and searched pursuant to border authorities.  Those contents and the computer media have been and remain in the lawful possession of the United States Department of Homeland Security since that time, and although law enforcement officers in the District of Connecticut might already have all necessary authority to analyze the material, and to image and search the computer media in the shipment, the government seeks this search warrant out of an abundance of caution to be certain that further analysis of the items, and imaging and analysis of the computer media in the shipment, for additional evidence of the referenced offenses, will continue to comply with the Fourth Amendment and other applicable laws.  The contents of the shipment, including not only the originals, but images / copies, are in the process of being sent to the District of Connecticut for such further review and analysis and to search for further evidence of the criminal violations referenced herein.  Those materials will be in the District of Connecticut shortly, and within the two week window in which the execution of the requested Rule 41 search warrants must begin; and the further review and analysis pursuant to the requested warrants will be conducted once the property / premises are received in, and located in Connecticut.

27

61. During the course of his post-arrest interview, KHAZAEE also provided written consents to search: (1) his former apartment located at 345 Oakland Street, Apartment 37, Manchester, Connecticut; (2) his most recent residence located at 5317 Holly Springs East Drive, Indianapolis, Indiana; and (3) his vehicle in Indiana, a Gold 1993 Toyota bearing Indiana license plate 751 BOP and Temporary Tag 3816724.

62. During execution of the consent searches in Indiana, law enforcement agents recovered, from KHAZAEE's apartment located at 5317 Holly Springs East Drive, Indianapolis, Indiana, the Lenovo, Model 4446 Laptop Computer, bearing serial number S/N L3-BFV1D 09/05, which was on a black sticker on the back of the laptop. The laptop has been and remains in the lawful possession of the United States Department of Homeland Security, is currently in the possession of HSI in New Haven, Connecticut, and although law enforcement officers in the District of Connecticut might already have all necessary authority to image and analyze the contents of the laptop, the government seeks the search warrant out of an abundance of caution to be certain that imaging and analysis of the laptop, for evidence of the referenced offenses, will continue to comply with the Fourth Amendment and other applicable laws.

### BACKGROUND CONCERNING EMAIL

63. Email providers such as Google / gmail provide a variety of on line services, including electronic mail ("email") access, to the public. Email providers allow subscribers to obtain email accounts at the domain name (e.g., gmail.com, yahoo.com, hotmail.com), like the email accounts listed in Attachment A / A-1. Subscribers obtain an account by registering with the email provider. During the registration process, an email provider often asks subscribers to provide basic personal information. Therefore, the computers of the email providers such as those identified herein are likely to contain stored electronic communications (including

28



retrieved and unretrieved email for their subscribers) and information concerning subscribers and their use of the email provider's services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify or confirm the account's user or users.

64. An email provider subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by the email provider. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

65. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

66. In my training and experience, email providers also typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account

(such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

67. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify or confirm the account's user or users.

68. In my training and experience, I have also learned that, in general, an email that is sent to a subscriber of an email provider such as those referenced herein are typically stored in the subscriber's "mail box" on the email provider's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the email provider's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on email provider's servers for a certain period of time.

### TECHNICAL TERMS AND DEFINITIONS

69. The following technical terms and definitions apply to this affidavit and the attachments to this affidavit and the corresponding search warrants and to the extent necessary or



applicable, I seek authorization to search and seize the following computer related items and data
as they relate to the computer media involved in this request:

(a) Hardware:  Computer hardware includes (but is not limited to) any recording devices
to capture data; any data processing devices such as network servers, central processing units,
memory typewriters, and self contained "laptop" or notebook computers; internal and peripheral
storage devices such as fixed disks, external hard disks, floppy disk drives and transistor like
binary devices; peripheral input/output devices such as keyboards, printers, scanners, plotters,
video display monitors, and optical readers; related communications devices such as modems,
cables and connections; as well as any devices, mechanisms, or parts that can be used to restrict
access to computer hardware such as physical keys and locks.

(b) Storage Media: The method in which a computer is used is often revealed by data
contained on the computer data storage media. Data used by and stored on computer systems can
be maintained in a number of forms, including electronic, magnetic and optical.  Storage media
customarily used include floppy disks, Zip and Jazz disks, CDs, DVDs, data tapes, and
removable hard drives, are used to store data files that contain the documents, correspondence
and other records prepared, used and maintained in the course of the activity described above.

(c) Software:  The method in which a computer is used is also revealed by computer
software.  Computer software is digital information which is used by a computer and its related
components to direct the way they work.   Software is stored in electronic, magnetic, optical or
other digital form.  It commonly includes programs to run computer operating systems,
applications (like word processing, graphics, billing, or spreadsheet programs), utilities,
compilers, interpreters, and communications programs.

(d) Computer related documentation:  This consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure and use computer hardware, software, or other data and related items.  This may also include notes and materials on the computer that contain instructions on how to perform various functions of the computers and codes and passwords used to access software, data files and ISP accounts, including but not limited to web hosting and electronic communications service providers.  These materials are created, used and maintained by individuals to operate computer systems.

(e)  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static that is, long term IP addresses, while other computers have dynamic that is, frequently changed IP addresses.

(f)  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders.

### SEARCH AND SEIZURE OF ELECTRONIC STORAGE MEDIA

70.  *Electronic Storage Media.*  As used in this affidavit, the term "electronic storage media" includes all equipment that can store, collect, analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  This includes any data-processing devices (such as central processing units, memory typewriters, self-contained



"laptop" or "notebook" computers, and cellular phones and "smartphones"); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, flash drives, thumb drives and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communication devices (such as routers, modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

71. As described herein and in the attachments, this application seeks permission to search for evidence and records in whatever form they are found. One form in which the records might be found is data stored on electronic storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

72. I submit that when searching the electronic storage media, there is probable cause to believe such records will be stored on that electronic storage media, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage media, deleted, or viewed via the Internet. Electronic files downloaded to storage media can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools because when a

person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, electronic storage media — in particular, computers' internal hard drives — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

73.  *Forensic evidence.*  As further described herein and in the attachments, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the subject premises because:

a.      Data on the electronic storage media can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a

34

paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage media that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage media that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on electronic storage media can also indicate who has used or controlled the media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the electronic storage media at a relevant time.

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on electronic storage media that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on

35

other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a particular electronic storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

74.  In addition, I know that when an individual uses a computer to obtain unauthorized access to a victim computer, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

75.  *Necessity of seizing or copying electronic storage media.* In most cases, a thorough search of a premises for information that might be stored on electronic storage media requires the seizure of the physical media and later review consistent with the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic storage media, and to prevent the

loss of the data either from accidental or intentional destruction. This is true because of the following:

a. Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it may be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

b. Searching computer systems also requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices may also be relatively large. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, computer seized can easily contain the equivalent of 250 million pages of data, which, if printed out, would result in a stack of paper over ten miles high. Further, a 500 GB drive could contain as many as approximately 250 full run movies or 450,000 songs.



d.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

76.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing or imaging electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## REQUEST FOR SEALING

77.  It is also requested that the warrants and accompanying applications and this affidavit be sealed until further order of the Court, in order to avoid disclosing the scope and nature of the investigation prematurely; to avoid compromising the ability of law enforcement

authorities to develop further evidence, including evidence in the grand jury; to avoid interfering with the ability of law enforcement authorities to secure the testimony of witnesses; and to avoid compromising the potential for law enforcement authorities to seize relevant evidence later in the investigation. In short, premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

78. It is therefore respectfully requested that this Court seal, until further order of the Court, all papers submitted in support of this application, including the affidavit, applications and search warrants, although notice and copies of the search warrants will be provided at the time of execution in accordance with Rule 41 of the Federal Rules of Criminal Procedure. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation and there may well be other potential subjects or targets of this investigation who may not be aware of this matter and will not be subject to the requested searches.

## CONCLUSION

79. Based on all the foregoing there is probable cause to believe, and I do believe that violations of Title 18, United States Code, Section 2314 (transportation of stolen property in interstate or foreign commerce); Title 18, United States Code, Section 1832 (theft of trade secrets); Title 22, United States Code, Section 2778 (the Arms Export Control Act or "AECA"), the Iranian Transactions and Sanctions Regulations, Title 31 Code of Federal Regulations, Part 560, and the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701-1707 ("IEEPA") have occurred and that evidence of such violations may be found on the premises / property described in Attachments A through C.

80.  I therefore respectfully request that warrants issue authorizing the searches of the premises / property described in Attachments A through C,  so that law enforcement agents may search for and seize evidence of the violations of 18 U.S.C. §§ 2314 and 1832, 22 U.S.C. § 2778, 31 C.F.R. Part 560, and 50 U.S.C. §§ 1701-1707, as described in Attachments A-1 through C-1.

81.  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
DAVID GUIDA, SPECIAL AGENT
DEFENSE CRIMINAL INVESTIGATIVE SERVICE


Sworn and subscribed to before me this ⎯3⎯1⎯st⎯ day of January 2014, at Bridgeport, Connecticut.


_____
/s/ William I. Garfinkel
HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

40